NEW HAVEN, The. See Case No. 280.

NEW HAVEN, The (The GEORGE M. DALLAS v.). See Case No. 5,338.

NEW HAVEN, The (REED v.). See Case No. 11,649.

NEW HAVEN CLOCK CO. (TERRY CLOCK CO. v.). See Cases Nos. 13,840 and 13,841.

NEW HAVEN, M. & W. R. CO. (LEE v.). See Case No. 8,197.

---

## Case No. 10,161.

### The NEW JERSEY.

[Olc. 415.] [1]

District Court, S. D. New York. July, 1846.

COLLISION—BETWEEN STEAM AND SAIL—DUTY OF EACH VESSEL—EVIDENCE.

1. Steamboats having greater facilities than vessels under canvas to avoid collisions when they are brought in proximity to each other, are bound to give way to sailing vessels when practicable, or take other proper precautions within their means for avoiding collisions.

2. But steamers are not bound to insure the safety of sailing vessels against their own

---

1 [Reported by Edward R. Olcott, Esq.]

negligence or misconduct. A sailing vessel is bound to exercise equal care, skill and prudence in passing a steamer as another sailing vessel; the only distinction being that in respect to a steamer, the vessel under sail is to adhere to her own course as far as practicable, and when so doing is not manifestly perilous to both or either.

[Cited in The New Champion, Case No. 10, 146.]

3. A sailing vessel, suing a steamer for damages from a collision, must prove that the injury was not produced by her own negligence or fault; particularly that she did not depart from her course when near the steamer, without a clear necessity for so doing.

4. Loose declarations or admissions extracted from or freely made by portions of a crew directly after a wreck from collision, will have but slight weight in invalidating their deliberate testimony to the facts.

5. A vessel wrongfully or carelessly interposed in the track of another so as to render a collision inevitable to the latter, is responsible therefor the same as if the blow was given by her movement directly against the one striking her.

[Cited in brief in Austin v. New Jersey Steamboat Co., 43 N. Y. 78.]

This was an action brought for the recovery of damages occasioned by a collision. The libellant, John H. Stebbins, alleges that he was the owner of the sloop Hamlet; that in the month of October last the said sloop sailed from the port of Bristol, on the Hudson river, on a voyage from thence to New York, with a cargo of flagging and other stones on board; that she was staunch and well built, and of about ninety tons burthen; that she was proceeding at the rate of about four or five miles per hour until she arrived at a point on the Hudson river called Blue Point; that the wind then failed, and the sloop then proceeded, with the force of the current and very little wind, about one or two miles an hour; that those on board of the sloop then observed the steamboat New Jersey coming up the river at the rate of about twelve or fifteen miles per hour, and nearer to the east shore of said river than the sloop; that the man at the helm was ordered to head the sloop more to the west shore of the river, which was done; that when the New Jersey arrived near the sloop, she changed her course to the westward and headed across the bows of the sloop, and attempted to pass to the westward of said sloop, by means of which she struck the end of the said sloop's bowsprit, and carried away about ten or twelve feet of it, and the stays attached thereto, and forcing her round by the blow, struck her on the larboard bow with such violence that she sunk her with her cargo. The libellant further alleges, that it was impossible for the Hamlet to get out of the way of the New Jersey, the sloop having little way on, and at the time at the westward of the steamer, and that there was room enough for the steamer to have passed to the eastward of the sloop; that by said collision the libellant has suffered damage to the amount of three thousand five hundred dollars. The answer of the claimant admits

the ownership, the voyage and loading of the sloop as alleged, but denies that she was well built and staunch; avers that she was not thoroughly manned, that the master was not on board, and no competent person in charge of said sloop. That the collision occurred about two o'clock in the morning, the steamboat, having a tow-boat of about two hundred tons burthen, was on the west side of the river, and westward of the course of the sloop; that the steamboat had had a fair tide until a little time before the collision; the wind was from the westward, and blowing a stiff breeze before and at the time of the collision; that the steamboat was slowed, and was stopped about the time of the collision; that she did not cross the bows of the sloop, nor the course the sloop was running at the time the sloop came in sight; and further avers, that the collision arose from the short luffing of the sloop through the fault of those in charge of her, which those in charge of the steamboat could not have foreseen or guarded against, whereby the sloop was run into the steamboat. He denies that the sloop was running as slow as alleged after the arrival at Blue Point, or that the steamboat was running at the rate of twelve or fifteen miles an hour, or that the steamboat was nearer the east shore than the sloop. He further avers, that as the steamboat was passing to the west of the sloop, and the sloop coming down was passing to the east of the steamboat, the course of the sloop was suddenly altered, and so directed to the westward, as to run into the steamboat. He further avers, that the collision happened within the body of the county of Ulster or of Dutchess, and not within the admiralty and maritime jurisdiction of this court; that this court has no jurisdiction of this cause of complaint.

Burr & Benedict, for libellant.
F. B. Cutting, for claimant.

BETTS, District Judge. The proofs show that the sloop Hamlet, owned by the libellant, on her passage to New York from Bristol, on the North river, came in collision with the steamboat New Jersey, owned by the claimant, and was immediately sunk. The occurrence took place in the night time, in October last, on the western side of the river, about half way between Blue Point and Sands' Dock, a mile or two below Poughkeepsie. The sloop was heavily laden with stone; she had a fair wind, but light and unsteady, and was running nearly directly down the river, about one-third its breadth off the west shore. The channel of the river at the place was half a mile wide, with flats each side of it extending a quarter of a mile, making the whole water surface about three-quarters of a mile in width. The early part of the night had been thick and dark, and the wind strong from the north. At the time of the collision, the wind had

much subsided; sailing vessels were floating upon a slack tide at the rate of from two to four miles the hour, and could be seen at a distance of from a half to a mile off. The steamboat was proceeding, with one barge in tow attached to her larboard side, at a speed estimated on board to be six miles the hour, and by persons upon vessels she met and passed, at from ten to twelve miles. The endeavor of the libellant has been to show that the steamboat was negligently headed across the bows of the sloop, and crowded so near to her track as to come afoul of her, and cause her loss. The effort of the claimant has been to prove that the steamboat was properly conducted, and that the sloop carelessly, or from mismanagement, was turned off her true course, and run directly upon the steamboat.

The laws of navigation impose no general duties or liabilities on steamboats in relation to collisions with sailing vessels not common between themselves, and to that class of vessels also; each is bound, under all circumstances, to use, with reasonable promptitude and skill, all the means in their power to avoid a threatened collision. Abb. Shipp. (Perkins' Ed.) 238, 311, 312; Car. & P. 538; Lowry v. The Portland [Case No. 8,583]; 1 W. Rob. Adm. 157. It is only because the means at command by steam vessels are so much more efficacious and ready than those possessed by sailing vessels, and that the consequences of an omission to apply such means are so immediate and destructive, that vessels propelled by steam are required to use the more watchful precautions, and to avoid vessels under canvas whenever it is plainly within their power to do so, without waiting for any correspondent exertions on the part of the sailing vessel. The Perth, 3 Hagg. Adm. 414; The Shannon, 2 Hagg. Adm. 173. Yet the vessel under sail must contribute to the common security by holding steadily to her course, or take positive measures, if any are within her power, to prevent a collision, and avoid counteracting or embarrassing the steamer in the use of her powers to that end. The owners of steamboats are not to be made insurers against the negligence, ignorance or misconduct of persons in charge of sailing vessels. If a collision occurs through the inattention, want of skill or blameable conduct of the latter, which the steamer, in the use of reasonable endeavors, could not avoid, the consequences must fall upon the vessel in the wrong the same as if both vessels were of the same description. It thus becomes indispensable, in actions for damages by owners of sailing vessels against steamers, to prove ordinary care and skill on their part, and negligence or wilful fault on the part of the steamboat, though the latter may be liable to the implication of a delinquency when it might not, in like circumstances, be imputed to a sailing vessel which fails to avoid a collision.

The answer in this case sets up a state of facts which, if proved, would exonerate the steamer from responsibility for the injuries received by the sloop, because it in effect charges her with having departed from her proper course suddenly and run upon the steamer, or placed herself in the way of the latter. A sailing vessel meeting a steamer is entitled, in all ordinary circumstances, to keep her way; but the privilege involves a corresponding obligation to adhere to that course, and thus give the steamer the opportunity to employ its superior facilities to secure the safety of both. A change of direction by the sailing vessel, or manoeuvre indicating the intention to change it, may embarrass the steamer, or prevent the use, in time, of the power to vary or stop her own way; and a collision so produced must be laid to the fault of the vessel and not to that of the steamer. If, then, the allegation of the answer that the steamer was on a course which would have carried her clear of the sloop had not the latter abruptly luffed, and thus come unexpectedly across her track and into her, had been supported by the proofs, it is clear that she would not only have been acquitted on this libel, but would be entitled to prefer her own claim for damages so sustained.

I do not propose to spread out the testimony in detail; the result of it, in my opinion, is that the claimant's own witnesses contradict the answer in two particulars of considerable moment in a question of culpable inattention or misconduct; first, in proving that the steamer crossed the track of the sloop in full view, and less than a third of a mile from her bows; second, in proving that the steamer had not been previously on the west shore; and third, upon the whole evidence it is at least doubtful whether the steamer was not in the act of crossing the river from the east shore, steering westward, when the collision occurred. The testimony of the two men on board the sloop, strongly corroborated by those on board other sloops in the immediate vicinity, and who saw the position and course of the steamer and sloop, is positive that the steamer stood in a direction across the bows of the sloop in a course from the east to the west shore. It also very satisfactorily appears, from a comparison of the testimony of these witnesses, that the steamer did not, as is asserted in the answer, commence her course from the eastern shore to the western, at a point from one-half to three-quarters of a mile further down the river than the place of collision; because all the testimony is that her course was up the river, diagonally across, and the diagrams render it certain that the steamer could not have been on the western shore rounded to up the river, when the pilot observed the sloop luffing one-third of a mile off. The pilot of the Washington supposed the steamer had time, after she began crossing, to get to the westward of the sloop, and head up,

before reaching the place of collision. He was, however, half a mile below; and after he fell into her wake, he pursued her course, and judged it would bring him over at about Blue Point, which is proved to be as far north of the place of collision as Sands' Dock is south of it. I am satisfied, that giving due weight to all the evidence, it is proved that the collision occurred whilst the steamer was going towards the west shore, and before she had passed the sloop, and got to the west of her. This necessarily places the steamer in a culpable position, attempting to cross the track of a sailing vessel and run under her bows, when she was entitled by law to hold her course, and it was the business of the steamer to leave it free to her.

The actual collision, as described by eye witnesses, and as far as it can be judged from concomitant circumstances, was not produced by any misconduct or want of care on the part of the sloop. The answer charges it to have been produced by the sudden change of the direction of the sloop from eastward down the river to westward towards and directly upon the steamboat. The pilot of the steamer is the only witness called to support the answer to this point. He describes two movements of the sloop into the wind, (or luffing,) which brought her upon the steamer. He says he first saw her a mile or more ahead, and laid his course to clear her; and if she had continued the course she was then pursuing, there would have been left him one-third the breadth of the river west free. The sloop was coming straight down the river, and when one-third of a mile from him, she changed her direction, luffed, and bore more for the steamer. He might have gone clear, notwithstanding, had she adhered to the new course; but fearing she would not leave him room, he slackened the speed of the steamer, and hailed her to keep away; then stopped the boat, and repeated the hail; the man at the tiller immediately shoved down the helm, which luffed the sloop directly into the wind; at the instant that movement was made, he rung the bell to back the steamer, and the sloop came, head on, hard into the steamer. This statement was not materially varied on cross-examination. He was still more emphatic that the sloop luffed twice, and added that he backed his boat twice, once at the instant of collision and again to keep clear of the sloop after the collision. The pilot is confirmed as to the working of the machinery by the engineer of the boat; and the declarations of the two men on the deck of the sloop, made on board the steamer that night and immediately after the sloop sunk, are proved, in which they represented that the sloop had luffed once, and the man at the helm said he had orders from the forward man to luff again, and at the same time to bear away. I do not regard these declarations of much moment if entirely credited; but the hasty assertions of men under such circum-

stances, in the confusion and fright of the moment, and in answer to the kind of questioning which most likely would take place, would weigh very slightly against their deliberate statements, when collected in mind and not appearing to testify under any bias or prejudice, and not discredited in character.

The intrinsic evidence, it appears to me, is very cogent against the representations of the pilot. The relative and actual speed of the two vessels is given as matter of conjecture, and no dependence can be placed on either for accuracy. The witnesses of the libellant estimate the speed of the steamer at ten to twelve knots; the engineer supposes she was not going over six or seven, and the pilot judges the speed of the sloop much greater than any person on board her, or sailing in her company. Assuming, however, a reasonable medium, and that the united speed with which the two vessels were approaching each other was ten miles the hour, they would strike in two minutes from the time the pilot saw the sloop luff. The engineer estimates that as the time occupied in giving two signal bells. No evidence is given that a sloop deeply laden, and scarcely more than floating with the current, could be brought, in two minutes, by any action of her helm, from a direction heading down the river and bearing eastwardly, to one westward and at right angles with a steamer running up the river. The inherent probabilities are forcibly against such supposition. But that statement does not present the full force of the presumption against the statement of the pilot; for he testifies, that after his boat was stopped, the helm of the sloop was shoved down, which luffed her, in his words, "directly round," and brought her into him nearly head on. The sloop must have been, at that moment, standing down the river in a direction opposite to his, and close beside him, to enable him to see so minute a manoeuvre in a dark night, and it would require great weight of evidence to convince the mind that she could have been brought instantaneously round under the circumstances, on her heel as it were, so as to be driven into the steamer. The men on board the sloop state, that when the steamer was observed stretching over from the east shore, and making for the sloop, she was luffed some to give way for the steamer to pass under her stern, and was then steadied, and was holding her course down the river as the steamer crossed her bows and struck the bowsprit. The pilot of the Eliza Wright, and captain and pilot of the Van Buren, both near the Hamlet, confirm this testimony. They all testify that the steamer was crossing the river west, and west northwest; she ran down to the Eliza Wright, and a light being shown from that vessel, she sheered more west, and attempted to run under the bows of the Hamlet, about half way between the Eliza Wright and the shore, and struck her bowsprit. This was within two minutes after passing the Eliza

Wright. The Van Buren was a few rods in rear of the Hamlet, running in her wake, and the captain and pilot give the same statement of the course of the steamer, and say the Hamlet was steering directly down the river when the collision occurred. The captain of the Excelsior, the first sloop passed by the steamer after her direction distinctly made to the west, says she ran close to him, so near that he thought she was coming into him, and that he kept his eye on her till the collision, apprehending, from her course west and northwest amongst sloops in that part of the river, she would run foul of some one. He also testifies that she was bearing west at quick speed when he heard the crash.

The claimant contends that the manner the bowsprit of the sloop perforated the steamer demonstrates that the blow was given by the sloop, and at almost right angles, and outweighs the opinions and conclusions of all the witnesses as to the course of the steamer being across the river, and confirms the statement of her pilot that it was, on the contrary, up the river. I do not perceive how that consequence follows. The blow would be nearly perpendicular to the steamer on the hypothesis of their witness, as she was crossing the track of the Hamlet nearly at right angles, and must necessarily have the same effect in that position of the vessels as if reversed, and the steamer was heading up the river and the sloop across it. More force would probably be given the blow if the sloop held her way upon the wind and current than if driven against the steamer after being luffed round. Either mode of contact would account for the effect produced, and it cannot accordingly be assigned as exclusively necessary to either. Nor is the question of the responsibility of the steamer affected by the fact that she received the blow, and was not directly the impinging body. She wrongfully placed herself under the bows of the sloop in her track, and when the sloop could by no manoeuvre avoid a collision; and she is in law answerable for the consequences the same as if her motion had been immediately upon the sloop. Negligently or unskilfully interposing one vessel in the path of another, which the latter is entitled to hold, and under circumstances preventing her extricating herself, renders the collision and the injury consequent upon it the wrongful act of the vessel so interposed. It was the business of the latter to get out of the way of the former. 2 Dod. 83; Story, Bailm. § 611; Abb. Shipp. (Perkins' Ed.) 307. The sloop, in this instance, was sunk by the collision, and went down almost instantaneously. I think the proofs fasten the blame on the steamer, and she must accordingly be held responsible for the entire loss sustained by the libellant. The special fact ought not to be overlooked, that the steamer was running in a dark night, at her ordinary speed, amidst a thicket of vessels, without its being shown that any person on board her was on the lookout except the pilot at the wheel, or

that any other person was at the time on deck. This was a most culpable want of precaution in her navigation.

The decree must be entered condemning the steamboat in the damages inflicted by the collision, and it will be referred to a commissioner to ascertain and compute the amount.

[For the hearing on exceptions to the commissioner's report, which report was confirmed in part, see Case No. 10,162.]